IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION


**GEORGE HUFF,**

      **Petitioner,**

**vs.**                         **CASE NO. 4:04cv308-RH/WCS**

**JAMES CROSBY,**

      **Respondent.**

_____/


## REPORT AND RECOMMENDATION

This is a petition for writ of habeas corpus filed by George Huff pursuant to 28 U.S.C. § 2254. Doc. 1. Petitioner challenges his conviction for aggravated battery with a deadly weapon or causing great bodily harm. The conviction was in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 95-2254. The petition was timely filed. Respondent filed an answer and the record below. Doc. 11. Petitioner filed a traverse. Doc. 18.

**Procedural History**

The incident giving rise to Petitioner's conviction occurred late in the evening on July 14, 2000, at Bennett's Overnight RV Park in Tallahassee, Florida. Doc. 11, Ex. C,

initial brief on appeal, Statement of Facts, p. 3.  Randall Brazier was found stumbling

around at the RV Park.  *Id.*  He had knife wounds and was bleeding.  *Id.*

Petitioner, who lived at the Park, said in his statement after his arrest that he

found Brazier sleeping on a covered porch that Petitioner claimed as his space.  *Id.*, p.

4.  Petitioner lived in an adjacent shed.  *Id.*  Petitioner had had quite a bit of beer to

drink that day.  *Id.*  He had had eight to ten beers.  *Id.*, p. 12.  He woke Brazier and told

him to leave because he did not want crack addicts hanging around his place.  *Id.*, p. 4.

Petitioner said that Brazier became extremely angry and attacked him.  *Id.*  Petitioner

said in his statement that Brazier

> picked up the [picnic table] bench and hit me square in the face, broke my
> nose, all my teeth are loose.  And then he attacked me.
>
> After he hit me with the bench, blood was pouring out of my nose and my
> mouth.  I was on the ground and he came after me.  I had a pocketknife
> and I defended myself.

*Id.*, pp. 4-5.  Petitioner asserted that his facial injuries were confirmed by medical

examinations.  *Id.*, pp. 6-7.

Brazier said that he passed out, having used alcohol and cocaine.  *Id.*, p. 8.  He

said he awoke with someone yelling and tugging at him.  *Id.*  He could not remember

how he got to the RV park.  *Id.*  Brazier could not recall doing anything to Petitioner, and

did not remember picking up a bench.  *Id.*, p. 9.  There was medical evidence that

Brazier suffered a five or six inch deep hole in his digestive tract, a stab wound to his

left chest, a wound to his rear, and a wound to his eyebrow.  *Id.*, p. 10.  Brazier's blood

alcohol level was 0.313.  *Id.*

Petitioner was charged by information with aggravated battery with a deadly weapon causing great bodily harm in violation of FLA. STAT. § 784.045(1)(a).  Doc. 11, Ex. A, R. 8.  He was convicted after a jury trial and was sentenced to 15 years in prison.

Petitioner unsuccessfully raised four issues on direct appeal: (1) error in denial of a motion for judgment of acquittal because the circumstantial evidenced did not exclude a reasonable hypothesis of innocence; (2) error in admission of evidence in the testimony of Detective Hertz in violation of the hearsay rule and the Confrontation Clause; (3) error in admitting an inflammatory photograph of the victim's surgical incision; and (4) that the prosecutor's closing arguments were fundamentally unfair. Doc. 11, Ex. C, pp. 19-20.  The First District Court of Appeal affirmed without an opinion.  *Id.*, Ex. F.

Petitioner filed a Rule 3.850 motion which, as amended, alleged eight claims of ineffective assistance of counsel.  The motion was denied without a hearing.  The denial was affirmed on appeal.

**Evidence at Trial**

Petitioner said that Brazier was sleeping on the couch when he tried to wake him up.  Doc. 11, Ex. B (trial transcript), pp. 239-240.  He said that he shook Brazier's foot and "hollered again," and the victim

> jumped up from the couch in – I can only describe it as a rage.  He said, you son-of-a-bitch, I'll get up.  With that, he grabbed the end of the picnic table, which was right beside the couch, and flipped it over, length-wise end over, directly at me.

*Id.*  He said that Brazier "grabbed the end of the table and just flipped it over like that" and "I blocked the table from – it would have hit me in the face."  *Id.*, p. 241.  Petitioner testified that

> Mr. Brazier had taken a couple of steps and picked up the bench that was on the other side of the picnic table and was holding it horizontally like you would a battering ram.  And before I could do anything, as soon as I pushed the table out from in front of me, he slammed me directly in the face with this bench, the end of the bench.

*Id.*  Petitioner said that this knocked him to the ground.  *Id.*  "I hit the ground like a bag of rocks."  *Id.*, p. 242.  He said that he "saw Mr. Brazier advancing towards me again with the bench."  *Id.*  Petitioner pulled his pocket knife.  *Id.*  Brazier "had changed the direction and angle of the bench and started to bring it down on my head as I was on my back on the ground."  *Id.*  Petitioner said that he blocked the bench with his shin.  *Id.*  Brazier dropped the bench and jumped on top of Petitioner, and Petitioner started swinging with the knife.  *Id.*, pp. 242-243.  Petitioner said Brazier was "directly over me, straddling me."  *Id.*, p. 243.  He said:  "I just wanted this man off me.  I felt certain he was trying to kill me."  *Id.*

Petitioner testified that after the fight, he went to a friend's house, "Rick," and stayed with him.  *Id.*, p. 250.  He said that the next morning, he picked up the picnic table and the bench and "put items back in place where they belonged on the slab."  *Id.*

Petitioner testified that after he arrived at the jail, he was examined by the medical staff.  *Id.*, p. 254.  He said he was given antibiotics for the cuts inside his mouth, some Tylenol for pain, a fracture was found in his jawbone by x-ray, and his teeth were loose.  *Id.*, p. 255.  A nurse at the jail said she observed that Petitioner had a "busted lip."  *Id.*, p. 280.

Brazier testified that he "passed out."  Doc. 11, Ex. B, p. 201.  As noted earlier, his blood alcohol content was 0.313.  He could not recall if he went to sleep on a couch or a bench (though Petitioner said he found him asleep on the couch).  *Id.*, p. 221.  He said that he awoke to find "something hitting me or punching me or stabbing me or whatever."  *Id.*, p. 201.  He could not say that he was stabbed.  *Id.*, p. 219.  Brazier testified that he sat on a chair after the stabbing.  *Id.*, p. 205.  He did not say he sat on the couch afterwards.  Instead, he said he just walked away across the grass after being stabbed and then he "fell out."  *Id.*, p. 204.  He sat on the chair later.  Brazier said that the first thing he remembered of the incident is standing up and see a person in silhouette and saying, "you son-of-a-bitch, you stabbed me."  *Id.*, p. 223.

Brazier said that he did not remember picking up the picnic bench.  *Id.*, p. 211.  He did not recall hitting Petitioner in the face with the bench.  *Id.*, p. 222.  Brazier said that on the day of the incident, he was five feet nine inches tall and weighed 162 pounds, the biggest he had been in his life; he said it was not a "healthy weight," but was weight gained from an unhealthy diet, and he weighed 132 pounds on the day of his testimony.  *Id.*, p. 225.

Rhonda Cannon testified that she was about 200 yards away in the trailer park, and saw nothing unusual until she saw Brazier stumbling along after he had been stabbed.  Doc. 11, Ex. B, p. 27.  It is not clear whether she could have heard a fight, the turning over of the picnic table, or the clubbing of Petitioner with the bench from where she was, but she said that she did not hear any fight.  *Id.*, p. 39.

Detective Hertz said there was a pool of blood on the couch.  *Id.*, pp. 69, 98.  Hertz said that Petitioner said in his statement to Hertz just after his arrest that the

picnic table and bench were in front of the couch.  *Id.*, p. 83.  Petitioner told Hertz that

after Brazier hit him with the bench, "blood was pouring out of my nose and mouth," and

Petitioner said he was "on the ground."  *Id.*  Petitioner told Hertz that after he stabbed

Brazier, he went to the other end of the RV Park and "just crashed in the bushes back

there."  *Id.*, p. 86.

Detective Hertz also testified as to what out-of-court witnesses told her.  That

testimony is set forth in detail ahead with respect to Ground Two.

Deputy Mike Smith said that he took a small pocketknife from Petitioner.  *Id.*, p.

120.  The knife was tested for the presence of blood with negative results.  *Id.*, p. 188.

Petitioner said in his statement to Hertz that the pocketknife the police took from him

when he was arrested was not the pocketknife he used to stab Brazier.  *Id.*, pp. 83-84.

He said he had "no idea" where the weapon he used was.  *Id.*, p. 84.  Hertz said they

did not find the knife used to stab Brazier.  *Id.*, p. 100.

The treating physician confirmed that Brazier had a blood alcohol level of 0.313.

*Id.*, p. 137.  He said that this meant that Brazier was "pretty drunk."  *Id.*

Ronnie Whitmire testified that he works for the Leon County Sheriff's office as a

crime scene detective.  *Id.*, p. 148.  He obtained some blood swabs and cuttings from

the couch and from the concrete floor in the common area.  *Id.*, p. 153.  He also

collected blood samples from Petitioner and Brazier.  *Id.*, p. 162.

Josephine Roman testified that she was a crime laboratory analyst for the Florida

Department of Law Enforcement, with a specialty in analysis of blood and body fluids.

*Id.*, p. 172.  She analyzed the blood samples.  *Id.*  She said that the DNA of the blood

on the couch, in front of the couch, and under the bench matched the DNA of Brazier.

*Id.*, p. 185.  The only blood at the scene that matched Petitioner's DNA was found on two T-shirts.  *Id.*, pp. 185-186.  There was no evidence that any of Petitioner's blood was on the ground in front of the couch or in the area around the bench.  *Id.*, p. 186.

L. A. Mosley, a physician's assistant at the jail, examined Petitioner on July 17th, two days after the incident.  *Id.*, p. 297.  He testified that he started Petitioner on medication for pain and swelling, and prescribed antibiotics because his lower lip was kid of swollen and there was the possibility of infection.  *Id.*, p. 295.  He said that he had x-rays done as well.  *Id.*  Petitioner also had an abrasion on the lower left leg.  *Id.*, p. 296.  The x-rays as read by the radiologist showed fractures of the mandible (jaw) and left lower leg.  *Id.*  There was a minimal fracture of the nose.  *Id.*, p. 297.  Mosley said that he reviewed the "wet" x-rays and did not see any fractures of the mandible or left leg.  *Id.*, p. 299.

Anthony D. McGuire, a dentist, testified that he examined Petitioner's four remaining lower teeth.  *Id.*, p. 307.  He found no tooth fractures, but a "small hairline fracture of his anterior mandible, the lower jaw, where he had his remaining four teeth."  *Id.*, p. 307.  The fracture was "square on the chin."  *Id.*, p. 308.  The teeth were loose.  *Id.*  The looseness of the teeth could have been from his moderate or advanced periodontal disease or from traumatic injury.  *Id.*, pp. 309, 311.  Dr. McGuire said that Petitioner "would have gotten that [the hairline fracture of the mandible] from some sort of glancing blow.  I don't think it was a direct blow or any kind of hit with any object or anything because the fracture was so benign," it was "barely there."  *Id.*, p. 311.  Dr. McGuire was then shown the x-ray taken by the jail medical staff, and he could not see any fracture of the mandible on that x-ray.  *Id.*, pp. 312-313.

**Section 2254 Standard of Review**

"Federal habeas relief is available to state prisoners only after they have

exhausted their claims in state court.  28 U.S.C. §§ 2254(b)(1), (c)."  O'Sullivan v.

Boerckel, 526 U.S. 838, 839, 119 S.Ct. 1728, 173, 144 L.Ed.2d 1 (1999); §§ 2254(b)

and (c).  In order to fully exhaust state remedies, "state prisoners must give the state

courts one full opportunity to resolve any constitutional issues by invoking one complete

round of the State's established appellate review process."  526 U.S. at 845, 119 S.Ct.

at 1732.  This "one complete round" requirement applies to post-conviction review as

well, and a prisoner must appeal the denial of post-conviction relief in order to properly

exhaust state remedies.  Leonard v. Wainwright, 601 F.2d 807, 808 (5th Cir. 1979)[1]

(Florida prisoner must appeal denial of Fla.R.Crim.P. 3.850 relief to exhaust remedies);

White v. Godinez, 192 F.3d 607 (7th Cir.1998), *cert denied*, 120 S.Ct. 1004 (2000)

(finding no "appreciable difference between direct appeals and post-conviction appeals

in this regard," holding Boerckel requires appeal following collateral review);[2] Anthony v.

Schuppel, 86 F.Supp.2d 531 (D. Md. 2000) (petitioner failed to properly exhaust under

O'Sullivan because she did not seek further review in the state appellate court of denial

of her post-conviction motion).

> In order to establish proper exhaustion of state court remedies, a
> petitioner must have "fairly presented" the substance of his federal claims
> to the state courts by raising both the factual and legal premises of the

---

[1] The Eleventh Circuit adopted as precedent decisions of the former Fifth Circuit
rendered prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1209
(11th Cir. 1981).

[2] The case was before the Seventh Circuit on remand for further consideration in
light of O'Sullivan.  192 F.3d at 608 (citations omitted).

claims for relief that are now being asserted in the federal habeas
proceeding.  The state court must have been given a fair opportunity to
apply controlling legal principles to the facts bearing upon the claim now
being raised. *See Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887,
888, 130 L.Ed.2d 865 (1995); *Anderson v. Harless*, 459 U.S. 4, 6-8, 103
S.Ct. 276, 277-78, 74 L.Ed.2d 3 (1982); *Picard v. Connor*, 404 U.S. 270,
275-78, 92 S.Ct. 509, 512-13, 30 L.Ed.2d 438 (1971). . . .  *Both the legal
theory and the facts on which the federal claim rests must be substantially
the same for it to be the substantial equivalent of the properly exhausted
claim*.

Henderson v. Campbell, 353 F.3d 880, 898 n. 25 (11th Cir. 2003), *cert. denied*, 125

S.Ct. 160 (2004).

A state prisoner bringing a defaulted constitutional claim to federal court has the

burden of demonstrating cause and prejudice for the default before obtaining relief.

Engle v. Isaac, 456 U.S. 107, 129, 102 S.Ct. 1558, 1572-1573, 71 L.Ed.2d 783 (1982),

reaffirming the holding in Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d

594 (1977); Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 2565, 115 L.Ed.2d

640 (1991).  Ineffective assistance of counsel may constitute cause for a procedural

default.  Murray v. Carrier, 477 U.S. 478, 488-89, 106 S.Ct. 2639, 2645-46, 91 L.Ed.2d

397 (1986).

For claims which were properly exhausted and adjudicated in state court, this

court's review is limited.  "[A] determination of a factual issue made by a State court

shall be presumed to be correct," and Petitioner has "the burden of rebutting the

presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1);

Bui v. Haley, 321 F.3d 1304, 1322 (11th Cir. 2003) (citing the statute, footnote omitted).

Moreover, as to a factual issue adjudicated by the state court, Petitioner must show that

the adjudication "resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2); 321 F.3d at 1322 (citing the statute).  Section 2254(d)(2) is satisfied "only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." Lomholt v. Iowa, 327 F.3d 748 , 752 (8th Cir. 2003) (citing § 2254(e)(1), other citation omitted).

As to legal findings, a petitioner is entitled to federal habeas relief only if the state court's adjudication of the merits of the federal claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." § 2254(d)(1).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meanings. Williams v. Taylor, 529 U.S. 362, 404-406, 120 S.Ct. 1495, 1519-1520, 146  L.Ed.2d 389 (2000) [3]; Bell v. Cone, 535 U.S. 685, 694, 122 S.Ct. 1843, 1850, 152 L.Ed.2d 914 (2002) (citing Williams).  "[C]learly established Federal law, as determined by the Supreme Court of the United States," refers only to holdings of the Supreme Court, but decisions of lower federal courts may be considered to the extent that they demonstrate how those courts applied Supreme Court  precedent. Hawkins v. Alabama, 318 F.3d 1302, 1309 (11th Cir. 2003) (citations omitted).

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal

---

[3] This was Justice O'Connor's opinion for the Court in Part II; the rest of the opinion for the Court (Parts I, III, and IV) was by Justice Stevens.

principle from this Court's decisions but unreasonably applies that
principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. at 1523; 535 U.S. at 694, 122 S.Ct. at 1850.

The law governing ineffective assistance of counsel claims was clearly
established in Strickland v. Washington, 466 U.S. 668, 690, 694, 104 S.Ct. 2052, 2066,
2068, 80 L.Ed.2d 674 (1984).  Williams, 529 U.S. at 405-406, 120 S.Ct. at 1519-1520;
Bell, 535 U.S. at 694-695, 122 S.Ct. at 1850.  Under the two part test of Strickland,
Petitioner must demonstrate both deficient performance and prejudice to the outcome.

To establish deficient performance, a petitioner "must identify the acts or
omissions of counsel that are alleged not to have been the result of reasonable
professional judgment."  466 U.S. at 690, 104 S.Ct. at 2066.  In reviewing the claim,
"counsel is strongly presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional judgment."  466 U.S. at
690, 104 S.Ct. at 2066.  Petitioner has a heavy burden to establish the deficient
performance prong of Strickland, by showing that "no competent counsel would have
taken the action that his counsel did take."  Fugate v. Head, 261 F.3d 1206, 1217 (11th
Cir. 2001) (citation omitted).  There are no rigid requirements, or absolute duty to
investigate a particular line of defense.  Id.

Indeed, "[c]onsidering the realities of the courtroom, more is not always
better.  Stacking defenses can hurt a case.  Good advocacy requires
'winnowing out' some arguments, witnesses, evidence, and so on, to
stress others."

261 F.3d at 121 (citations omitted).

For prejudice, Petitioner must show "a reasonable probability that, but for
counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome."  466 U.S. at 694, 104 S.Ct. at 2068.

Although Strickland explained the performance and prejudice prongs of analysis, "there is no reason . . . to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697, 104 S.Ct. at 2069.  "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."  *Id.*

If the state court identifies and applies the framework of Strickland in assessing an ineffective assistance claim, its adjudication does not satisfy the "contrary to" language of § 2254(d)(1) even if this court might have applied Strickland differently. Williams, 529 U.S. at 406, 120 S.Ct. at 1520; Bell, 535 U.S. at 698, 122 S.Ct. at 1852. To determine whether the state court's adjudication was an "unreasonable application" of Strickland, Petitioner "must do more than show that he would have satisfied *Strickland's* test if his claim were being analyzed in the first instance . . . .  Rather, he must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner."  Bell, 535 U.S. at 698-699, 122 S.Ct. at 1852 (*citing* Williams).   "[T]he most important point is that an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  Williams v. Taylor, 529 U.S. at 410, 120 S.Ct. at 1522.

**Ground One**

Petitioner contends that he was arrested in violation of the Fourth Amendment. He contends that as a consequence, the statement he made incident to his arrest should have been suppressed.

This claim should have been raised on direct appeal.  It is not a claim that could have been raised in a Rule 3.850 motion.  Reaves v. State, 593 So. 2d 1150, 1151 (Fla. 1st DCA 1989).  The claim was not raised on direct appeal.  Doc. 11, Ex. C, initial brief on appeal, pp. 19-20.  Therefore, it is procedurally defaulted.

Further, a federal court lacks authority to review a claim that statements were the fruit of an illegal arrest where, as here, the state provides a full and fair opportunity for litigation of the claim.  Stone v. Powell, 428 U.S. 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976); Devier v. Zant, 3 F.3d 1445, 1455 (11th Cir. 1993), *cert. denied*, 513 U.S. 1161 (1995).

If a valid Fourth Amendment claim is defaulted by ineffective assistance of counsel, however, the claim is cognizable as a Sixth Amendment claim under Strickland.  Kimmelman v. Morrison, 477 U.S. 365, 375-77, 106 S.Ct. 2574, 2582-84, 91 L.Ed.2d 305 (1986).  Consequently, the court cannot now reach the merits of this claim except in connection with an ineffective assistance of counsel claim.  Petitioner has raised this claim with respect to Grounds Seven and Eight, which are addressed ahead.

**Ground Two**

Petitioner asserts that admission of hearsay statements in the testimony of Detective Hertz violated his rights to due process and under the Confrontation Clause.[4] Respondent contends that Petitioner argued only the state law evidentiary question on direct appeal, and contends that the federal Confrontation Clause claim was not fairly presented. Respondent asserts that the federal claims are procedurally defaulted.

The title of Petitioner's claim on appeal mentioned both the hearsay rule and the Confrontation Clause. The due process claim, therefore, was procedurally defaulted because it was neither mentioned nor argued.

While the argument necessarily focused upon whether it was error to find that Petitioner had "opened the door" to the admission of this evidence by his cross examination of the witness, the argument relied heavily upon Ramirez v. State, 739 So. 2d 568 (Fla. 1999) and Pacheco v. State, 698 So. 2d 593 (Fla. 2d DCA 1997). Doc. 11, Ex. C, Petitioner's initial brief, pp. 31-32. Ramirez cited federal cases for the proposition that the Confrontation Clause is violated by use of a confession of a co-defendant against the accused when the co-defendant does not testify. 739 So. 2d at 579. The passage quoted in Petitioner's initial brief from the Pacheco case explicitly found a violation of both the Florida hearsay rule and the Confrontation Clause. Doc. 11, Ex. C, p. 32, citing 698 So. 2d at 595. Thus, the Confrontation Clause claim was fairly presented to the state courts.

Detective Debra Hertz was the lead detective. Doc. 11, Ex. B (transcript of the trial), p. 105. She testified that during the initial part of her investigation, Jimmy Gregory

---

[4] Petitioner's brief on appeal has been relied upon for the specifics of this claim. Doc. 11, Ex. C.

"gave me information leading to the crime scene." *Id.*, p. 10.  Jimmy Gregory later told Hertz that his roommate, Paul Martin, had some information for her.  *Id.*, p. 13. Petitioner's counsel objected to any hearsay statement from Gregory or Martin, and the objection was sustained.  *Id.*  The prosecutor agreed that in his questions of Hertz, he would only establish that during this part of the investigation, Petitioner became a suspect.  Petitioner's counsel agreed that this would be unobjectionable.  *Id.*, p. 14.

On cross examination of Detective Hertz, Petitioner's attorney established that Hertz and Deputy McClure spoke with several witnesses at the trailer park, got "differing versions and differing statements from those people," and "out of that, the name George Huff is the person that lives there and may have been involved in the altercation."  *Id.*, p. 101.  Counsel then established that Hertz had interviewed Petitioner and found out that Petitioner's nose was broken, he thought his jaw was broken, his teeth were loose, and he said he had been struck in the face.  *Id.*, pp. 103-104.  Hertz confirmed that Petitioner said that he was defending himself.  *Id.*, p. 106.  Hertz was then asked whether there was any evidence that Petitioner was *not* defending himself, and Hertz said "no."  *Id.*  Counsel established that after she arrested Petitioner, Hertz "pretty much closed the case" "without the benefit of any corroborating witness."  *Id.*, p. 107.

On redirect, the State asked Hertz to tell the jury what "differing versions" she received from the people she had interviewed.  *Id.*, p. 109.  A hearsay objection was sustained.  *Id.*, p. 110.  The court, however, allowed counsel to elicit from the witness that significantly differing versions were obtained from witnesses and to "clarify in general terms," but instructed that the witness could not testify as to what everybody told her.  *Id.*, p. 111.  The State then established that Jimmy Gregory and Paul Martin

told Hertz "basically the same thing," and their statements were in agreement without conflicts.  *Id.*, p. 112.  Hertz said that based upon the statements of Gregory and Martin, she arrested Petitioner, but she said that Gregory and Martin were not available as witnesses for the trial.  *Id.*, p. 113.  Finally, Hertz said that "there in fact [was] evidence that showed that [Petitioner] was not defending himself."  *Id.*

Petitioner's attorney was permitted to conduct re-cross examination, and counsel again established that either Gregory or Martin or both gave a different story to Deputy McClure.  *Id.*, p. 115.  Then counsel asked:

> Q.     . . .  Neither of those people actually saw the altercation, did they?
>
> A.     One saw part of it.  Heard the altercation and walked out and saw the defendant lunging at the victim.
>
> Q.     But, nobody ever saw anyone get stabbed or anything like that?
>
> A.     No, not to my knowledge.

*Id.*, p. 115.

On redirect, the State established that one witness saw "two lunges at the victim."  *Id.*, p. 116.  The State also established that one witness "heard [the victim] say, get off me.  And then he walked outside.  He saw the defendant lunge twice at the victim."  *Id.*, p. 117.

"The confrontation clause is not implicated where the defendant seeks to introduce hearsay declarations as part of his defense."  United States v. Parikh, 858 F.2d 688, 695 (11th Cir. 1988) ("Defense counsel effectively caused the injury about which he now complains by questioning the witness about the contents of the letter. This invited error constitutes neither plain nor reversible error.").  However, "[s]ince the

application of the invited error rule here would be tantamount to a waiver of the Sixth Amendment right to confrontation, a purposeful rather than inadvertent inquiry into the forbidden matter must be shown."  United States v. Taylor, 508 F.2d 761,764 (5th Cir. 1975).

Taylor involved a bank robbery.  The prosecution had agreed not to use inculpatory statements made by the co-defendant if the defendant would agree to abandon his motion for a severance.  The inculpatory statement was that the co-defendant had said that he and defendant had "hidden the clothes that they used and gun under an abandoned house."  508 F.2d at 763.

The prosecution had not given the text of this statement to defendant's counsel before counsel began the cross examination of the FBI agent.  Defendant's counsel asked the FBI agent about an inconsistency between the testimony of one witness, that the weapon used in the bank robbery was a sawed-off shotgun, and the agent's testimony, that it was a sawed-off *rifle*.  *Id.*, at 764.  He asked the agent if he asked "them" to explain this inconsistency, and the agent said "it was described to me" as a sawed-off rifle.  *Id.*  Defendant's attorney asked who so described it, implying in the question that it was another FBI agent, and the agent said it was the co-defendant who described the weapon as a sawed-off rifle.  *Id.*  Apparently after this, under a theory that the "door had been opened," the prosecution was able to place into evidence the full text of the co-defendant's statement, including the incriminating part quoted above.

The court found this to have violated the Confrontation Clause.  It found that defendant's attorney had not been provided the statement at issue prior to beginning cross examination, so he entered the forbidden territory inadvertently rather than

purposefully.  It further noted that there had not been any reference to a "statement" by the co-defendant, so there was no need for the prosecution, on redirect, to have provided the complete statement for a "proper understanding of the testimony given." *Id.*

In the case at bar, Petitioner pursued a line of cross examination that was "a purposeful rather than inadvertent inquiry into the forbidden matter."  Taylor, 508 F.2d at 764.  The probable cause affidavit was filed in the record on July 14, 2000, and it stated in part:

> The witness advised he heard the defendant and the victim arguing at or about 2230 hours.  The witness said he knows both the victim and the defendant.  The witness said he heard the victim yell, "get off of me, get off of me."  The witness said he stepped out of his camper and observed the defendant "lunge" at the victim twice, at which time the victim staggered off.

Doc. 11, Ex. A, R. 3.  Thus, Petitioner's attorney knew that one of the witnesses had told the police that he had seen the fight and heard the victim yell "get off of me."  Thus, unlike the Taylor case, Petitioner's attorney knew what might come out if he pushed too hard.

Further, counsel's cross examination pursued an arguably reasonable strategy. Counsel first purposefully tried to establish that the absent witnesses gave differing stories and did not have any evidence that Petitioner was not defending himself.  These were useful points in defense, and they were not contradicted by the probable cause affidavit.

On re-cross, counsel tried to establish that neither witness actually saw the "altercation," and he did this with a leading question.  The response denied the premise

of the question ("neither of those people actually saw the altercation, did they") and then explained what the witness said he saw.  The answer was responsive to the question, since counsel was trying to establish that the out-of-court witnesses had not seen anything.  A fuller explanation of the answer to this leading question, which was negative, was compelled by the question, whether then or on redirect.

A similar case is <u>Cartwright v. State</u>, 885 So.2d 1010, 1014 (Fla. 4th DCA. 2004), construing Florida evidence law.  The court said:

> The primary consideration in deciding whether a party has opened the door to comments on cross-examination is whether the witness's answer is responsive to the question asked.  If it is, then it is considered invited error.  *See Terry v. State*, 668 So.2d 954, 962 (Fla.1996); *Sneed v. State*, 736 So.2d 1274, 1275 (Fla. 4th DCA 1999).  In this case, the victim was asked by defense counsel what he did with the defendant's belongings.  It was not unresponsive for him to enumerate the items he recalled finding in describing what he had done with them.

885 So.2d at 1014.

While it may be argued that the answer was not responsive as it called for a yes or no answer, the testimony would have come out on redirect in any event since Petitioner's attorney had used the word "altercation" to characterize the incident.  This left the impression in the jury's mind that the witness had concluded that neither party was at fault.  This was untrue because the witness's statement in the probable cause affidavit had expressed no opinion as to fault.  Further, Petitioner's attorney knew that the answer to his leading question (whether the witness had said he had *seen* anything) was negative since he had the probable cause affidavit, and so his leading question invited the answer, whether then or on redirect.

Finally, that the prosecution elicited what the witness had heard was invited error because Petitioner's counsel had purposefully asked a question that caused Hertz to say that the witness said he had heard something.  The prosecutor was justified in clearing up this last point rather than leaving it hanging unanswered.

Even if there were a Confrontation Clause violation,"the error was harmless beyond a reasonable doubt."  Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 694 (1986) (applying the harmless error rule to a Confrontation Clause violation); United States. v. Edwards, 211 F.3d 1355, 1358 (11th Cir.), *cert. denied*, 531 U.S. 911 (2000).  The hearsay evidence elicited in this case sounds initially as if it were inculpatory, but it really was not especially damaging to Petitioner.  It was Petitioner's defense that he stabbed Brazier during a fight on the concrete in front of the couch, not on the couch.  That a witness thought he heard Brazier say "get off of me" was potentially consistent with this defense as the witness could have mistaken Petitioner's voice for that of Brazier.[5]  That the witness saw Petitioner "lunging" at the victim was neutral evidence because this did not establish whether the lunging was while Brazier was on the couch or on the concrete in front of the couch.  Petitioner did not contend that he did not stab Brazier.  He would have to "lunge" at Brazier to defend himself against an attack with a picnic table bench and to inflict the wounds that Brazier suffered.

---

[5] Both men were drunk, and their speech should have been somewhat altered. The only evidence at trial of anyone "on" someone else was from Petitioner, that after Petitioner was knocked down, Brazier got on top of him and straddled him, so it was arguably more likely that the person demanding that the other "get off" of him was Petitioner.

Thus, a Confrontation Clause violation has not been shown, or if one has been shown, the error was harmless beyond a reasonable doubt.  Thus, the state appellate court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).[6]

**Ground Three**

Petitioner contends that the prosecutor's closing argument violated his right to due process.  Petitioner argues that the prosecutor improperly (1) accused him of tampering with the evidence and (2) of lying under oath.  Doc. 1, p. 5.  The specifics of these claims are taken from Petitioner's initial brief on direct appeal.  Doc. 11, Ex. C, pp. 38-39.  Petitioner contends that these arguments were not supported by evidence at trial.

---

[6] The hearsay evidence at issue here was probably "testimonial" as now defined by Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004) because it was elicited in what might be construed as "police interrogation" of the witnesses at the RV Park.  Even so, as discussed above, Confrontation Clause error may be invited error, as in this case, and therefore not reversible error.  Further, Crawford does not apply retroactively on post-conviction review.  Brown v. Uphoff, 381 F.3d 1219, 1226-27 (10th Cir. 2004), cert. denied, 125 S.Ct. 940 (2005); Mungo v. Duncan, 393 F.3d 327, 335-336 and n. 8 (2d Cir. 2004) (same, noting Uphoff), cert. denied, 125 S.Ct. 1936 (2005); Murillo v. Frank, 402 F.3d 786, 791 (7th Cir. 2005) (same); Evans v. Luebbers, 371 F.3d 438, 444-45 (8th Cir. 2004) (noting that Crawford did not appear to apply retroactively, but even if it did it did not apply to that case), cert. denied, 125 S.Ct. 902 (2005).  But see Bockting v. Bayer, 399 F.3d 1010, 1020-21 (9th Cir. ) (finding, contrary to Uphoff and Mungo, that Crawford applies retroactively) (see also at 1029, J. Wallace, concurring in part and dissenting, noting that the retroactivity analysis was "contrary to that of three other circuits," citing Uphoff, Evans, and Mungo).

Respondent asserts that on direct appeal, Petitioner only cited state cases and thus only presented a state law claim. Thus, Respondent contends, the federal due process claim is procedurally defaulted.

Respondent's procedural default defense is unpersuasive. In the initial brief, Petitioner argued in part that the prosecutor's closing argument violated the Fourteenth Amendment. Doc. 11, Ex. C, initial brief, p. 37. Respondent argued the merits of the federal due process claim in Respondent's answer brief on direct appeal. *Id.*, answer brief, pp. 24-25, citing Darden v. Wainwright, 477 U.S. 168, 181-82, 106 S.Ct. 2464, 2471-72, 91 L.Ed.2d 144 (1986). Darden held:

> [I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d [1031 (11th Cir. 1983], at 1036. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

477 U.S. at 181, 106 S.Ct. at 2471. As noted in Respondent's brief on direct appeal, Darden provides that one must consider whether the prosecutor's argument manipulated or misstated the evidence, whether the argument implicated "other specific rights of the accused such as the right to counsel or the right to remain silent," whether the argument was "invited by or was responsive to the opening summation by the defense," whether the trial court gave limiting instructions, whether the weight of the evidence against the accused was so heavy that it was unlikely that the improper closing argument influenced the verdict, and whether the defense had the opportunity to rebut the improper argument. Darden, 477 U.S. at 182, 106 S.Ct. at 2472.

The first claim concerns the assertion that Petitioner tampered with evidence.

The prosecutor said in closing:

> Now, we heard from the victim.  As I say, he felt like he was getting
> punched on the couch or struck on the couch.  And we do see his blood.
> We know that is his blood on the couch, the cutting from the couch, and
> down here in front of the couch.  That's the victim's blood. . . .
>
> One thing I will note for you.  Take a look at that cushion.  It's been placed
> over an area of the blood. . . .  Somebody put that cushion there after the
> victim bled there.  Who could have done that?  Who would have gone
> back to the scene and tried to put that cushion back?  The defendant?
>
> And did he perhaps also knock the table over, try to make it seem – he
> had a little amount of time.  He would have seen the ambulance.  He
> would have seen the police cars.  But, you know he was in a hurry to get
> out of there.  And also it was dark.  So, why would he put the cushion over
> the couch?  He didn't have much time to think.  He doesn't really hide the
> blood, but you know that was placed after the victim bled there.
>
> So think about any tampering that may have occurred in the scene
> because you know it did if that cushion was placed there like that.  And
> who else would have placed it there?

Doc. 11, Ex. B, pp. 331-332.  The prosecutor later said:  "I'm not in any way arguing that

he is a grand master of tampering, but we do have evidence."  *Id.*, p. 376.

The phrases "we heard," "we know," and "you know" are relatively harmless and

not improper in this context.  These phrases were used here as rhetorical devices to

refer to the evidence, much of which was not disputed, rather than as an assertion of

personal belief.

Further, the prosecutor did not misstate the evidence.  The evidence indicated

that a cushion had been placed on top of the bloody couch after the blood had soaked

into the couch.  The contention that it was Petitioner who placed the cushion there, and

perhaps also knocked over the table, was not an unfair argument from the evidence.

These were reasonable inferences that might have been drawn from the placement of the cushion over the blood on the couch.

Petitioner also challenges the prosecutor's argument that he was lying under oath. The prosecutor argued that Mr. Huff "is not telling you the truth" about his own blood "pouring on the ground." Doc. B, p. 349. The prosecutor argued that "when he takes that stand, he is under the same obligation as any other witness to tell you the truth. And you are not getting the truth from him." *Id.*, p. 374. The prosecutor also argued that when Petitioner gave his statement after arrest, "he didn't say all that stuff on the tape about a battering ram or being down on the ground and getting struck with the bench," but "now, he wants to have the victim make more use of that bench during this trial," putting the bench "in the victim's hands twice now," and concluded:

> Now, why would Randall Brazier do this? This is what the defendant says. I think he was pissed off because his buddy ripped him off on some drug deal or something and left him there. I don't know what was going on.
>
> He is right, he doesn't know what was going on. He is making stuff up.

*Id.*, p. 355. The prosecutor also argued:

> I guess Mr. Huff wants you to believe that he [Brazier] was able to pick it [the picnic bench] up, put it on his shoulder and run at him, that he was about to get one end and flip it up? How? How does a person with a .313 [blood alcohol content] do that?
>
> So when he takes the stand to tell you the truth, he has nothing to prove to you, but he does have to be honest with you. And he is not.
>
> Now, what regard does he have to the oath that he took? You heard that Mr. Brazier is a convicted felon. You heard that he has got cocaine possession and a worthless bank check felony. But, what has he put to really target Mr. Huff? He still to this day could not tell you Mr. Huff stabbed him. Is he out to get Mr. Huff? Is he making up testimony to stick it to Mr. Huff? No.

So, in that regard, his credibility, is that the same issue that Mr. Huff has when you consider the credibility of Mr. Huff as a convicted felon?  He has come up and told you direct evidence of what he wants you to believe.  What regard does he have as a five-time convicted felon to tell you the truth?  Can you believe him?

*Id.*, p. 375-376.

Petitioner's testimony was contradicted by the circumstantial evidence, particularly with respect to where Petitioner's own blood was found.  Had blood poured from Petitioner's nose, his blood would have been found on the concrete.  It was not.  Only Brazier's blood was found there.  Further, it was improbable that a person with a blood alcohol content of 0.313 would have the coordination to use a picnic bench as a battering ram.  Given Petitioner's version of events and the contradictory evidence presented by the prosecution, the prosecutor's remarks were proper commentary upon the evidence.  At no point did the prosecutor express his personal belief as to Petitioner's credibility.  The prosecutor was "merely submitting to the jury a conclusion that he [was] arguing can be drawn from the evidence."  Craig v. State, 510 So.2d 857, 864 (Fla. 1987) (not improper to argue that defendant's testimony was untruthful and that he was a "liar"), *cert. denied*, 484 U.S. 1020 (1988).  Therefore, the state appellate court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).


**Ground Four**

Petitioner contends that he was denied due process because a portion of the jury instructions was wrong under Florida law.  He argues that he presented evidence of the

affirmative defense of the justifiable use of force as permitted by FLA. STAT. § 776.012
(1993).  He contends that it was error for the trial court to instruct the jury as to an
exception to this defense, pursuant to FLA. STAT. § 776.041(1), which provides that
force used to attempt to commit, to commit, or to escape after commission of an
aggravated battery is not justifiable.  Petitioner contends that several Florida courts
have held that this instruction is not proper where there is no evidence of the
commission of a felony by the defendant other than the aggravated battery itself.

Like Ground One, this is a claim that should have been raised on direct appeal,
but was not; it could not be raised in a Rule 3.850 motion.  Floyd v. State, 808 So. 2d
175, 181 ns. 8 and 9 (Fla. 2002).  The claim, therefore, is procedurally barred.  The
court cannot reach the merits of the claim except as to the related claim of ineffective
assistance of counsel, discussed ahead.

**Ground Five**

Petitioner contends that his conviction was a denial of due process for lack of
sufficient evidence.  Respondent contends that Petitioner did not fairly present this
federal claim on his direct appeal.

Florida has a special rule regarding the sufficiency of evidence to sustain a
conviction when all of the evidence is circumstantial.

> A special standard of review of the sufficiency of the evidence applies
> where a conviction is wholly based on circumstantial evidence.   Where
> the only proof of guilt is circumstantial, no matter how strongly the
> evidence may suggest guilt, a conviction cannot be sustained unless the
> evidence is inconsistent with any reasonable hypothesis of innocence.

Dupree v. State, 705 So. 2d 90, 94 (Fla. 4th DCA 1998), *quoting,* State v. Law, 559
So. 2d 187, 188-189 (Fla.1989).

This is not the federal due process standard.  The federal standard is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).  Jackson v. Virginia rejected a standard which requires the prosecution to exclude every reasonably hypothesis of innocence.

> Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained.  That theory the Court has rejected in the past.  *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150.  We decline to adopt it today.

443 U.S. at 326, 99 S.Ct. at 2792-93.[7]

On direct appeal, Petitioner argued that "the lower court erred in denying the motion for judgment of acquittal where the state's circumstantial evidence case failed to exclude a hypothesis of innocence."  Doc. 11, Ex. C, initial brief, p. 22.  Petitioner quoted this rule of Florida law from State v. Law, *supra*.  Petitioner did not cite the federal due process standard at all.  Accordingly, the due process claim was not fairly presented to the state courts and is procedurally defaulted.  Since Petitioner has not

---

[7] "[T]he Supreme Court has rejected the 'theory that the prosecution (must) rule out every hypothesis except that of guilt . . . .' " Cosby v. Jones, 682 F.2d 1373, 1383 (11th Cir. 1982), quoting Jackson, 443 U.S. at 326, 99 S.Ct. at 2793.  "It is not required that the evidence rule out every hypothesis except that of guilt beyond a reasonable doubt."  Wilcox v. Ford, 813 F.2d 1140, 1143 (11th Cir.), *cert. denied*, 484 U.S. 925 (1987).  "The simple fact that the evidence gives some support to the defendant's theory of innocence does not warrant the grant of habeas relief."  *Id.  Accord,* Carter v. Montgomery, 769 F.2d 1537, 1542 (11th Cir. 1985) (it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.)

shown cause for the default or prejudice to the outcome, the court cannot reach the merits of this claim.

**Ground Six**

Petitioner contends that his due process rights were violated by the introduction into evidence of a photograph of the victim's surgical incision, that is, the surgery necessitated by the knife wound in the abdomen.  He asserts that the photograph showed a surgical incision running from the lower portion of Brazier's abdomen to the top of his chest.  Respondent contends that this claim is procedurally defaulted because on direct appeal Petitioner presented only state law arguments concerning the photograph.

On direct appeal, Petitioner cited Czubak v. State, 570 So. 2d 925 (Fla. 1990), Pangburn v. State, 661 So. 2d 1182 (Fla. 1995), and Marshall v. State, 604 So. 2d 799 (Fla. 1992), for the law governing the admission of prejudicial photographs.  Doc. 11, Ex. C, initial brief, p. 36.  Those cases only concerned Florida evidence law, and more particularly, the rules governing the interaction of evidentiary relevance and undue prejudice.  Czubak, 570 So. 2d 928 ("This Court has long followed the rule that photographs are admissible if they are relevant and not so shocking in nature as to defeat the value of their relevance."); Pangburn, 661 So. 2d at 1187 ("[A]dmission of gruesome photographs may be improper when they are irrelevant or other photographs are adequate to support the State's contentions."); Marshall, 604 So. 2d at 804 ("Such photographs [of the victim's head during autopsy] were admissible to assist the medical examiner in explaining the nature of the wounds and the manner in which they were inflicted.").  Petitioner's argument from these cases was a relevancy argument:

The photograph was irrelevant.  Other photographs and the surgeon's testimony adequately depicted the victim's injuries.  The photograph needlessly inflamed and prejudiced the jury.

*Id.*

Thus, it would appear that Petitioner did not fairly present the federal claim. However, unlike the other procedurally defaulted claims discussed above, there is precedent in this circuit that the argument made above was sufficient to exhaust state court remedies as to the federal due process claim.

In this case it was unnecessary that petitioner's trial counsel make specific reference to the due process clause in objecting to admission of the photographs; objection on the grounds that the photographs were gruesome and unduly prejudicial was sufficient to preserve petitioner's due process claims for habeas review.

Osborne v. Wainwright, 720 F.2d 1237, 1239 (11th Cir. 1983).  Consequently, this court should address the merits of this claim.

The federal due process standard is more limited than the state evidentiary rule:

The admission of prejudicial evidence justifies habeas corpus relief only if the evidence "is material in the sense of a crucial, critical, highly significant factor."

Osborne, 720 F.2d at 1238 (citations omitted).[8]  "The introduction of graphic photographic evidence rarely renders a proceeding fundamentally unfair."  Jacobs v. Singletary, 952 F.2d 1282, 1296 (11th Cir. 1992).

The particular photograph is not in this record.  But the court does not need to see this photograph to find that its admission into evidence did not render Petitioner's trial fundamentally unfair.  A surgical incision that has been closed, even one like this

_____

[8] This is why it would seem that Petitioner's state law arguments did not raise the federal claim.

where a colostomy was in place, is not gruesome or inflammatory.  Such a photograph simply shows the work of the physician.  A photograph of a surgical incision is less gruesome than a photograph of raw knife wounds.

Further, this photograph was necessary to show the degree of injury caused by the knife wound.  The offense required proof of "great bodily harm."  FLA. STAT. § 784.045(1)(a).  Much of the harm was internal, necessitating a large surgical incision and significant abdominal surgery.  The surgeon testified that the "stab wound had resulted in a puncture of [Brazier's] large intestine, so it had gone several inches inside."  Doc. 11, Ex. B, p. 131.  "The injury went into his chest, through his chest cavity, didn't penetrate his lung in this area inside, went through his diaphragm and into his abdomen and made a hole in his intestine about in that area."  *Id.*, p. 132.  The photograph, therefore, was relevant to the seriousness of the knife wounds and to illustrate the resulting surgery.  *Id.* and pp. 133-136.  Therefore, the state appellate court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Grounds Seven and Eight**

Petitioner contends that his trial attorney was ineffective for failing to argue the lack of probable cause for his arrest (Ground Seven) and for failing to move to suppress statements he made incident to that arrest (Ground Eight).  He asserts that counsel's default prevented him from raising this claim on direct appeal.[9]  That

---

[9] Petitioner complains that it is a "Catch 22" to have to prove Grounds One and Seven before the merits of Ground Eight can be addressed.  This is not true.  The

procedural default is noted in the discussion as to Ground One.  Respondent agrees

that state court remedies were exhausted as to this ineffective assistance claim

because Petitioner raised it in his Rule 3.850 motion.

The trial court denied this claim, finding that there was "sufficient probable cause

for the issuance of the affidavit and Defendant's subsequent arrest."  Doc. 11, Ex. J, ¶

3.  The court further found that since the arrest was not illegal, the claim that counsel

erred in failing to move to suppress his statement as the fruit of an illegal arrest was

moot.  *Id.*, ¶ 4.  The court attached a copy of the front of the probable cause affidavit.[10]

The affidavit stated that Brazier was stabbed twice at about 10:30 p.m. on July

14, 2000.  *Id.*  The affidavit further states in relevant part:

> This incident occurred at a community storage shed at Bennetts
> Overnight park, which is located at 5317 West Tennessee Street,
> Tallahassee[,] Florida.  The defendant [Petitioner] lives in a shed behind
> the storage building.  The victim was transported to Tallahassee
> memorial Hospital, where emergency surgery was required due to
> internal bleeding.  The victim had a stab wound to his left side and one to
> the right cheek of his buttocks.  The defendant fled the scene prior to law
> enforcement arrival.
>
> I responded to the scene and interviewed a witness that lives in seeing
> distance to the storage building.  The witness advised he heard the
> defendant and the victim arguing at or about 2230 hours.  The witness
> said he knows both the victim and the defendant.  The witness said he
> heard the victim yell, "get off of me, get off of me".  The witness said he
> stepped out of his camper and observed the defendant "lunge" at the
> victim twice, at which time the victim staggered off.

---

statements incident to the arrest could have been subject to suppression as the fruit of
an unlawful arrest only after the unlawfulness of the arrest had been shown.

[10] The affidavit is also in the trial record.  Doc. 11, Ex. A, R. 3.

> On Saturday 07-15-00, the defendant returned to his shed where he was
> *later arrested for this charge.*  The defendant was transported to the
> Sheriff's Office to be interviewed by this writer. . . .

*Id.* (emphasis added).

The affidavit also gives details of Petitioner's statement after the arrest.  Since

those details were not known until after Petitioner had been arrested, that evidence is

irrelevant to the question of probable cause to justify the arrest.

A meritorious basis for a motion to suppress is a necessary predicate to this

claim faulting counsel for failure to file such a motion.  Kimmelman v. Morrison, *supra*,

477 U.S. at 382, 106 S.Ct. at 2586.  "Probable cause exists if 'the facts and the

circumstances within the collective knowledge of the law enforcement officials, of which

they had reasonably trustworthy information, are sufficient to cause a person of

reasonable caution to believe that an offense has been or is being committed.' "

Madiwale v. Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997), *quoting,* United States v.

Jimenez, 780 F.2d 975, 978 (11th Cir. 1986); *see also* Rankin v. Evans, 133 F.3d

1425, 1433 (11th Cir.), *cert. denied*, 119 S. Ct. 67 (1998) (probable cause

determinations consider whether "a reasonable man would have believed [probable

cause existed] had he known all of the facts known by the officer.").

Aggravated battery occurs when, in committing a "battery," a person:

1.     Intentionally or knowingly causes great bodily harm, permanent
       disability, or permanent disfigurement; or

2.     Uses a deadly weapon.

FLA. STAT. § 784.045(1)(a).  A "battery" is the actual and intentional touching or striking

of another person against that person's will.  FLA. STAT. § 784.03(1)(a)1.

Detective Hertz had evidence from a witness who heard Petitioner and Brazier arguing, and heard Brazier yell for Petitioner to get off of him.  The witness said that as he came out of his trailer, he saw Petitioner lunge twice at Brazier and saw Brazier stagger off.  Brazier suffered knife wounds (great bodily harm).  Petitioner had fled.  The evidence from the witness was reasonably trustworthy as the witness said that he knew both Petitioner and Brazier and said that he had seen and heard these things.  This was sufficient to cause a person of reasonable caution to believe that an offense had been committed by Petitioner.[11]

Since probable cause existed for the arrest of Petitioner, Petitioner's attorney had no Fourth Amendment claim to make.  Attorney error for not making such a claim has not been shown.  Therefore, the state trial court's adjudication of the merits of this federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Nine**

Petitioner contends that his attorney was ineffective for failing to call a witness in his defense, Rhonda Cannon, who was Petitioner's friend.  Cannon testified for the prosecution.  Petitioner asserts that Cannon talked with Paul Martin, a possible source of the hearsay evidence discussed above.  He states that Cannon would have testified that Martin "denied making the statement attributed to him" by Detective Hertz.

---

[11] This analysis is not inconsistent with the harmless error analysis above because probable cause must be judged without the benefit of Petitioner's version of events.

Attached to Petitioner's Amended Rule 3.850 motion is a first page of a letter from Cannon to Petitioner. Doc. 11, Ex. J, attachment to Amended Rule 3.850 Motion. Cannon states that she talked with "Paul," and Paul said that "all he told the cops was he heard someone say get off me, get off me & when he looked out he saw shadows on the porch moving around. But it was to[o] dark to tell what was going on." *Id.* Thus, the testimony from Cannon would not have been that Martin denied making a statement, but that the statement he made was somewhat different from that reported by Detective Hertz. Respondent concedes that state court remedies have been exhausted as to this claim.

Petitioner has been permitted to supplement the record with excerpts from the deposition of Detective Hertz. Doc. 18, attachment. When asked whether Martin was able to give her the name of "who this person was," who had said that Petitioner was "the person who was lunging" at Brazier, she said she thought that it was Jimmy Gregory, but she was not really certain. *Id.*, p. 21. She then said she could not "tell you who provided the name out of the two." *Id.*, p. 22. However, in closing argument the prosecutor argued that this statement was from Paul Martin. Doc. 11, Ex. B, R. 135, transcript p. 76.

The trial court denied Petitioner's ineffectiveness claim, finding that "[t]he record clearly shows that defense counsel actually cross examined Rhonda Cannon . . . ." This is not a sufficient basis for rejecting this claim. Counsel did cross examine Cannon. Doc. 11, Ex. B, pp. 31-37. But the cross examination preceded the cross examination of Detective Hertz. There was no evidence yet about Paul Martin or anything he might have said, so there was no reason to try to impeach Hertz through

Cannon, as to what Martin told her.  Petitioner's claim is that Cannon should have been required to testify again for the defense after the existence and general substance of the Martin statement had come into evidence.  That claim was not addressed by the state circuit court.

Cannon's testimony as to what Martin said would have been inadmissible hearsay.  But Florida law recognizes that:

> As an evidentiary principle, the concept of "opening the door" allows the admission of otherwise inadmissible testimony to "qualify, explain, or limit" testimony or evidence previously admitted.  The concept of "opening the door" is "based on considerations of fairness and the truth-seeking function of a trial."

Dennis v. State, 817 So.2d 741, 753 , quoting, Rodriguez v. State, 753 So.2d 29, 42 (Fla. 2000) (citations omitted).  It is permissible to independently introduce hearsay evidence in rebuttal once the "door" is opened.  State v. Bradford, 658 So.2d 572, 574 (Fla. 5th DCA 1995).  This principle of law has been discussed at length above.

The error here, however, was invited by Petitioner's counsel, not by the prosecution.  It is doubtful that the trial court would have permitted Petitioner to continue to elicit more hearsay evidence on this subject from yet another witness.  Indeed, Petitioner's attorney so noted in arguing for a new trial.  Doc. 11, Ex. A, R. 239 ("Of course I didn't have an opportunity to elicit that [the Cannon evidence] because it's very much hearsay, and there's no way that's going to come in.").  Attorney error has not been shown.

Further, the lack of testimony from Cannon does not "undermine confidence in the outcome."  While seeing "shadows on the porch moving around" might seem less damaging than seeing Petitioner "lunging," the "lunging" testimony was not especially

damaging to Petitioner, as explained above.  Also, seeing only "shadows moving" on the porch might have been viewed by the jury as more consistent with Petitioner stabbing Brazier sleeping on the couch than with Brazier attacking Petitioner with a six or seven foot picnic table bench.

More importantly, however, this evidence would have been inconsequential in light of the many substantial inconsistencies in Petitioner's version of events compared with other evidence.  There was blood pooled on the couch, where Petitioner admits Brazier was sleeping.  Had Petitioner stabbed Brazier on the concrete, there would not have been blood pooled on the couch.  Petitioner said that after he was hit with the bench, blood poured from his nose.  Petitioner's blood should have been on the concrete, but the blood on the concrete was all from Brazier, and none matched Petitioner's DNA.

Brazier said he passed out.  His blood alcohol level, at 0.313, fully supported this testimony.  Brazier was very, very intoxicated.  Brazier weighed an "unhealthy" 165 pounds.  It is extremely doubtful that Brazier, passed out on the couch, would have had the strength, coordination, agility, or even the inclination, to awake, leap up, pick up a six or seven foot picnic table bench, balance it horizontally, and ram it into Petitioner's face, or that he could have done all of this with such sudden speed that Petitioner could not have avoided the blow.

Additionally, the dentist testified that Petitioner's chin injury was probably caused by some glancing blow and not by an object.  Petitioner fled, knowing that he had seriously injured someone.  Petitioner lost or hid the knife.  He gave two versions of his

flight.  He first said he "crashed" in some bushes.  He later said he stayed inside with a friend.

Had Cannon testified as she outlined in her letter, the outcome would not have changed.  Nor has attorney error been shown as to this point.  Ground Nine is without merit.

**Ground Ten**

Petitioner contends that his attorney was ineffective for failing to object to the prosecutor's improper closing argument.  The state court denied this claim, finding nothing in the closing argument to have been improper.  The closing argument was not improper for the reasons discussed above, and therefore attorney error has not been shown.  The state court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Eleven**

Petitioner contends that his attorney was ineffective for failing to present oral argument as to four of five grounds supporting his motion for a new trial.  The fifth issue that was argued was the admission of hearsay evidence.  In the traverse, Petitioner contends that his attorney should have argued the claim that the verdict was against the weight of the evidence.  Doc. 18, pp. 39-41.  The amended motion for a new trial argued that the "State failed to present competent and substantial evidence to support an Aggravated Battery Conviction."  Doc. 11, Ex. A, R. 52.  The motion presented no specifics of this argument.  Respondent agrees that state court remedies have been exhausted as to this claim.

A motion for a new trial determines whether the verdict is supported by the "weight of the evidence," that is, "whether a greater amount of credible evidence supports one side of an issue or the other."  Geibel v. State, 817 So. 2d 1042, 1044 (Fla. 2d DCA 2002).  "Thus, this rule 'enables the trial judge to weigh the evidence and to determine the credibility of witnesses so as to act, in effect, as an additional juror.' " Id., quoting, Uprevert v. State, 507 So. 2d 162, 163 (Fla. 3d DCA 1987) (quoting Tibbs v. State, 397 So. 2d 1120, 1123 n. 9 (Fla.1981)).

The trial court denied this claim.  At the hearing on the motion, the court said that:

> . . . the Court requested counsel to concentrate on the first ground asserted in the written motion.  Failure to argue every single ground in Defendant's Motion for New Trial is simply not ineffective assistance of counsel.  Counsel has limited time in which to argue before the court. Moreover, the Court was aware of all grounds raised.

Doc. 11, Ex. J, order denying Rule 3.850 motion, ¶ 8.

The transcript of the hearing on the motion for a new trial reveals that the court had asked, as to ground one of the amended motion (the hearsay issue), whether the error was harmless or was reversible error.  Doc. 11, Ex. A, R. 235.  The transcript does not otherwise seem to contain any special direction to limit argument to the hearsay issue.

The prosecutor said that Petitioner's attorney had approached him and asked if the State would agree to a sentence of time served.  *Id.*, R. 241.  The court said: ". . . [H]aving heard the facts of this case, I would not agree to sentence a person on a plea to time served for conduct that has been alleged *and, in my opinion, been proved.*"  *Id.*, R. 242 (emphasis added).  Concerning the hearsay evidence, the court said: "It was error.  I knew that 10 seconds after I made the ruling and the testimony was out.  I knew it was error."  *Id.*, R. 243.  The court said, however, that it would listen to argument as to why it was not error in the hopes of being educated on the issue.  *Id.* The argument of the prosecutor persuasively demonstrated that no error occurred as to the hearsay issue.  *Id.*, R. 243-281.

Petitioner has not come forward with any particular argument that might have been successful as to any of the other grounds for a new trial.  The trial court said that it found the charges to have been proven, and thus had already decided to deny the motion as to the weight of the evidence.  Consequently, the state court's adjudication of the merits of the federal claim has not "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  § 2254(d)(1).

**Ground Twelve**

Petitioner contends that his trial attorney was ineffective for failing to object to a jury instruction as to the forcible felony exception to justifiable use of force.  He contends that counsel's failure to object precluded raising the issue on direct appeal.  Respondent concedes that state court remedies have been exhausted as to this claim.

The following are the relevant self-defense instructions given in Petitioner's case:

> Now, an issue in this case is whether the defendant acted in self-defense. It is a defense to the offense with which George Huff is charged if the injury to Randall Brazier resulted from the justifiable use of force likely to cause death or great bodily injury.
>
> The use of force likely to cause death or great bodily harm is justifiable only if the defendant reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself while resisting any attempt to commit an aggravated battery upon him.
>
> A person is justified in using force likely to cause death or great bodily harm if he reasonably believes that the force is necessary to prevent imminent death or great bodily harm to himself or another, or the imminent commission of aggravated battery against himself or another.
>
> *However, the use of force likely to cause death or great bodily harm is not justifiable if you find George Huff was attempting to commit, committing or escaping after the commission of an aggravated battery*, . . . .

Doc. 11, Ex. B, pp. 387-388 (emphasis added).  After Petitioner's trial, a Florida appellate court decided that an instruction on the forcible felony exception to justifiable use of force is reversible error where the defendant has not been charged with a separate forcible felony.  Giles v. State, 831 So. 2d 1263 (Fla. 4th DCA 2002).

In ruling on this claim in the case at bar, the trial court found that this instruction was not misleading when considered in the context of all of the instructions given.  Doc. 11, Ex. J, ¶ 9.  The court also reasoned that the instruction was

> inapplicable because the Defendant was not committing some other felony apart from the use of force. Thus, the instruction may be considered excess verbiage because part of the instruction made it clear that force may be used to protect oneself when some other party is the aggressor and no other felony is being committed.

*Id.* The First District Court of Appeal concurred. The Court cited <u>Giles</u>, but held that "in this case, the trial court's inclusion of the forcible felony instruction within the overall body of instruction on self-defense was not misleading or confusing and did not deprive the appellant of his defense of self-defense." <u>Huff v. State</u>, 869 So. 2d 608 (Fla. 1st DCA 2004).

Respondent argues that it could not have been attorney error to fail to make this claim because the first case to rule that the instruction was improper was <u>Giles</u>, which occurred after Petitioner's trial. Petitioner argues that he did not rely solely upon the <u>Giles</u> case for this claim, but also cited the following cases in his Amended Rule 3.850 motion, all of which preceded his trial: <u>Mogavero v. State</u>, 744 So. 2d 1048 (Fla. 4th DCA 1999); <u>Wadman v. State</u>, 750 So. 2d 655 (Fla. 4th DCA 1999); <u>Davis v. State</u>, 804 So. 2d 400 (Fla. 4th DCA 2001); <u>Harris v. State</u>, 570 So. 2d 397 (Fla. 3d DCA 1990). None of the cases cited by Petitioner, however, involved aggravated battery or the particular instruction at issue here or in the <u>Giles</u> case, though they do stand for the rule that "[i]t is fundamental that the trial court should give a 'sufficiently complete and accurate' instruction so as not to 'negate the defendant's theory of defense.' " <u>Harris v. State</u>, 570 So. 2d at 399.

Respondent's argument concerning attorney error is correct. "In this circuit, we have a wall of binding precedent that shuts out any contention that an attorney's failure to anticipate a change in the law constitutes ineffective assistance of counsel." <u>United</u>

States v. Ardley, 273 F.3d 991, 993 (11th Cir. 2001) (Carnes, J., concurring) (cases

cited omitted), *denying rehearing en banc in*, United States v. Ardley, 242 F.3d 989,

(11th Cir. 2001), *cert. denied*, 535 U.S. 979 (2002).  Thus, it was not ineffective

assistance of counsel to fail to anticipate the Giles decision.

Further, the jury instruction does not appear to have prejudiced the outcome.

Both the trial court and appellate court looked at these jury instructions and determined

that the jury would not have been confused and viewed the instruction as surplusage.

The instruction at issue is: "the use of force likely to cause death or great bodily harm is

not justifiable if you find George Huff was attempting to commit, committing or escaping

after the commission of an aggravated battery."  Under no reasonable construction of

the evidence was there any support for the theory that Petitioner committed another

forcible felony prior to knifing Brazier in self-defense.  While it is possible that a jury

might be confused by an instruction that has no application to the facts of a case, as

the Giles case apparently found, the issue here is simply whether Petitioner was

deprived of the counsel guaranteed to him by the Sixth Amendment by counsel's failure

to object to this instruction.  As to this issue, it cannot be said that the state court's

adjudication of the merits of the federal claim has "resulted in a decision that was

contrary to, or involved an unreasonable application of, clearly established Federal law,

as determined by the Supreme Court of the United States."  § 2254(d)(1).

Accordingly, it is **RECOMMENDED** that petition for writ of habeas corpus filed by George Huff pursuant to 28 U.S.C. § 2254, challenging his conviction for aggravated battery with a deadly weapon or causing great bodily harm in the Circuit Court of the Second Judicial Circuit, in and for Leon County, Florida, case number 95-2254, be **DENIED WITH PREJUDICE**.

**IN CHAMBERS** at Tallahassee, Florida, on June 29, 2005.


**s/    William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 4:04cv308-RH/WCS